1                          UNREDACTED

2                IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TENNESSEE
3                         EASTERN DIVISION

4        --------------------------------------------------

5

UNITED STATES OF AMERICA              )
6                                      )
VS                                     )NO.17-10018
7                                      )JACKSON, TENNESSEE
                                       )
8    JOHN KEVIN PHILLIPS                )

9

10       --------------------------------------------------

11              PROBABLE CAUSE/DETENTION HEARING
                       MARCH 2, 2017
12

13                     FTR RECORDING

14

15        BEFORE THE HONORABLE EDWARD G. BRYANT,

16           UNITED STATES MAGISTRATE JUDGE

17

18

19

20                KRISTI HEASLEY, RPR
                 OFFICIAL COURT REPORTER
21            U.S. COURTHOUSE, SUITE 450
              111 SOUTH HIGHLAND AVENUE
22            JACKSON, TENNESSEE 38301

23

24

25

                     UNREDACTED TRANSCRIPT

2

APPEARANCES

FOR THE UNITED STATES:

BETH BOSWELL,Q ESQ.
UNITED STATES ATTORNEY'S OFFICE
109 South Highland Avenue
Suite 300
Jackson, TN 38301

FOR THE DEFENDANT:

MARTY B MCAFEE, ESQ.
THE MCAFEE LAW FIRM
246 Adams Avenue
Memphis, TN  38301

MICHAEL RYAN WORKING, ESQ.
THE WORKING LAW FIRM
917 South Cooper
Memphis, TN  38104

UNREDACTED TRANSCRIPT

3

1                          EXAMINATION INDEX

2

3    JOHN KRIEGER

4
          DIRECT BY MS. BOSWELL                          8
5         CROSS BY MR. MCAFEE                            20
          FURTHER DIRECT BY MS. BOSWELL                  27
6

7

8    ROBIN PHILLIPS

9
          DIRECT BY MR. MCAFEE                           30
10        CROSS BY MS. BOSWELL                           33

11

12   RHONDA GREER

13
          DIRECT BY MR. MCAFEE                           37
14        CROSS BY MS. BOSWELL                           40

15

16

17

18

19

20

21

22

23

24

25

                         UNREDACTED TRANSCRIPT

4

1                          EXHIBITS

2

3        1    Text Messages                              14

4        2    Photo                                      17

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

1                    (Defendant Present.)

2                    MS. BOSWELL:  Judge, I'm going to unseal

3    the complaint, but not the affidavit associated with that

4    based upon safety concerns, just some of the contents

5    that's in that.  The printed complaint document itself I

6    will unseal so that the courtroom can remain open.

7                    THE COURT:  The Court will grant the

8    motion of the government to unseal the -- be clear what

9    you are unsealing.

10                   MS. BOSWELL:  Complaint.

11                   THE COURT:  The complaint only.

12                   MS. BOSWELL:  Not the attachment.

13                   THE COURT:  Any attachments are not

14   unsealed.  Okay.  And that would be for Mr. Phillips.

15                   (Pause in proceedings.)

16                   THE COURT:  Are we ready?

17                   MR. WORKING:  Yes, Your Honor.  It's going

18   to be Mike Working and Mr. McAfee.

19                   THE COURT:  Now this is a -- let's see,

20   it's a probable cause and detention hearing on a

21   complaint.

22                   MR. MCAFEE:  We have not been able to get

23   anything up to now because it's been sealed (inaudible).

24                   THE COURT:  Okay.  Can we give a couple of

25   copies.

6

1              MR. MCAFEE:  We can go ahead and proceed
2    at this time.
3              THE COURT:  Okay.  Now in regard to the
4    detention hearing -- let me get my paperwork here
5    together.  I want to -- preparatory remarks as far as the
6    detention hearing.
7              This matter is before the Court this
8    afternoon for a pre-trial detention hearing at the
9    request of the United States Government.  And I believe
10   also this is a probable cause hearing as well today.
11             Now during today's hearing the government
12   will present evidence and the defendant, through his
13   attorneys, have a right to cross-examine any government
14   witnesses who may be called, to present witnesses of your
15   own, you are entitled to that, and to testify yourself.
16             Now you're not required to do any of these
17   things.  And you should be particularly aware that if you
18   should testify you could be cross-examined by the
19   government and you would be giving up your constitutional
20   right to remain silent and anything that you say may be
21   used against you at a later date.  Therefore, you should
22   carefully consult with your attorneys in regard to these
23   matters.
24             Also I'll note for the record that at the
25   pre-trial -- the defendant has, at his initial

1  appearance, been provided with copies of the charges

2  against him and had those explained as well, charges and

3  maximum penalties.

4            Also I would state finally that this

5  detention hearing is being recorded today.

6            Now we are ready to move forward.

7  Government may present --

8            MS. BOSWELL:  We call for the Rule, Your

9  Honor.

10            THE COURT:  Okay.  Now the government

11  calling for the Rule here.  Anyone who will be testifying

12  in this case will need to wait outside and we'll call you

13  in as we need your appearance to testify.  But you have

14  to wait outside of the hearing of what is going on in

15  this courtroom.

16            So we've got everybody that will possibly

17  be testify out of the courtroom.  Okay.  You may proceed.

18            MS. BOSWELL:  We call John Krieger, Your

19  Honor.

20            THE COURT:  All right.  Mr. Krieger, if

21  you will come up, circle back around over here.  Before

22  you have a seat raise your right hand and be sworn as a

23  witness.

24            ***************

25

UNREDACTED TRANSCRIPT

1               JOHN KRIEGER THEREUPON CALLED AS A WITNESS ON

2     BEHALF OF THE GOVERNMENT, AND HAVING BEEN FIRST DULY

3     SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4                         DIRECT EXAMINATION

5               THE COURT:  I think you are going to need

6     to spell your name as well when you get --

7               THE WITNESS:  Yes, Your Honor.

8     BY MS. BOSWELL:

9     Q.   Can you state your name, please?

10    A.   John Krieger, K-R-I-E-G-E-R.

11    Q.   Who do you work for?

12    A.   Drug Enforcement Administration.

13    Q.   How long have you been with them?

14    A.   About four and a half years.

15    Q.   And where did you work prior to that?

16    A.   I was local patrol cop in a suburb outside of St.

17    Louis.

18    Q.   How long did you do that?

19    A.   About four years.

20    Q.   Which division of the DEA are you assigned to?

21    A.   The tactical diversion squad.

22    Q.   Where is that located?

23    A.   Nashville Tennessee.

24    Q.   Does your squad also cover charges on defendants in

25    Federal cases here in Western District of Tennessee?

1   A.     Yes, ma'am.

2   Q.     Are all of the diversion portions of the DEA

3   located in Nashville?

4   A.     No, ma'am.

5   Q.     Are there -- the one located in Nashville, is that

6   the only one that would cover charges here in the Western

7   District of Tennessee?

8   A.     That's correct.

9   Q.     Did you get involved in an investigation against

10  John Kevin Phillips?

11  A.     Yes, ma'am.

12  Q.     When did you get involved?

13  A.     Last Friday.

14  Q.     That will be February 24th then of 2017?

15  A.     Yes, ma'am.

16  Q.     Is John Kevin Phillips connected to another

17  defendant that you're aware of?

18  A.     Yes, ma'am.

19  Q.     Who is that other suspect or potential defendant?

20  A.     Jeffrey Young, II.

21  Q.     Is there an open Federal investigation as to him at

22  this time?

23  A.     Yes, ma'am.

24  Q.     And who is the lead special agent on that case, or

25  open investigation, I should say, against Jeff Young?

1    A.    Stanley Jones.

2    Q.    Would Special Agent Jones, was he involved in

3    interviewing witnesses, employees, and other persons

4    involved with that open investigation?

5    A.    He was.

6    Q.    What is the connection between this defendant John

7    Phillips and Jeff Young?

8    A.    Based upon all the information that we've gathered

9    they're best friends.

10   Q.    What are you basing that on, what sources?

11   A.    Cooperating statements from cooperating defendants

12   or potential defendants, local law enforcement, social

13   media.

14   Q.    And what does Kevin Phillips do for a living?

15   A.    Pharmaceutical rep.

16   Q.    What does Jeff Young do for a living?

17   A.    Nurse practitioner.

18   Q.    What began this investigation last Friday?

19   A.    Confidential informant reached out to local law

20   enforcement because they were concerned about the well

21   being of Federal agent.

22   Q.    That Federal agent was who?

23   A.    Special Agent Stan Jones.

24   Q.    What was the concern?

25   A.    That Mr. Phillips was making threats against Stan

UNREDACTED TRANSCRIPT

11

1    Jones' welfare and life.

2    Q.    Was this corroborated in some way other than just

3    this source's word?

4    A.    It was.

5    Q.    How?

6    A.    Law enforcement downloaded the cell phone of the

7    confidential source and corroborated phone number that it

8    was sent from and to and what time and what it stated.

9    Q.    So the phone number that the text were sent from,

10   who is the scriber on that phone?

11   A.    John Kevin Phillips.

12   Q.    Okay.  What did the text then that were downloaded

13   from that phone in regard to threats to Stan Jones, what

14   did they say?

15   A.    Some of the text that were downloaded stated, I'm

16   going after Stan.  I don't make threats, I do.  Watch the

17   news.  We're both going to the hospital.  And I've got

18   nothing to lose.

19   Q.    Based upon those texts and information from the

20   source, was a state arrest warrant drafted?

21   A.    Yes, ma'am.

22   Q.    What was the charge on that?

23   A.    Retaliation for past action.

24   Q.    Was he arrested on this warrant?

25   A.    Yes, ma'am.

12

1    Q.    Who was with him at the time of the arrest?

2    A.    Angela Hazelhurst.

3    Q.    Who is she to him?

4    A.    His girlfriend, paramour.

5    Q.    Did she give consent to look on her phone?

6    A.    Originally, yes.

7    Q.    You say originally, was that consent revoked?

8    A.    At a later time during the same incident it was

9    later revoked.

10   Q.    Did you, in fact, seize that phone?

11   A.    I did.

12   Q.    And was the search warrant obtained out of the

13   Middle District of Tennessee for the contents of that

14   phone?

15   A.    Yes, ma'am.

16   Q.    In conversations with Ms. Hazelhurst did she tell

17   you how Mr. Phillips, how she had him entered in her

18   phone?

19   A.    Yes, ma'am.

20   Q.    How was that?

21   A.    Under Andrew P.

22   Q.    During the search of that phone did Mr. Phillips

23   also communicate to her threats regarding Stan Jones?

24   A.    Yes.

25              MS. BOSWELL:  I need just a minute, Your

UNREDACTED TRANSCRIPT

1    Honor.

2                    THE COURT:  Okay.  Take your time.

3    BY MS. BOSWELL:

4    Q.   Can you see that?

5    A.   Yes, ma'am.

6    Q.   We can see it.  I guess you should --

7    A.   Yes, ma'am.

8                    MS. BOSWELL:  Is yours working, Your

9    Honor?

10                   THE COURT:  Well, it might if I turn it on

11   here.

12              (ATTORNEY/ATTORNEY CONFERENCE.)

13                   MS. BOSWELL:  May I approach?

14                   THE COURT:  You may approach.

15   BY MS. BOSWELL:

16   Q.   Do you recognize that, Agent Krieger?

17   A.   Yes, ma'am.

18   Q.   What is that?

19   A.   It's a photograph of the text between Angela

20   Hazelhurst's phone and a contact in her phone listed as

21   Andrew P.

22   Q.   That's who she identified as this defendant

23   Mr. Phillips?

24   A.   Yes, ma'am.

25                   MS. BOSWELL:  Your Honor, I'd like to

1   introduce this as Exhibit 1.

2                    THE COURT:  Any objection?

3                    MR. MCAFEE:  No, sir.

4                    THE COURT:  Court will allow the

5   introduction of Exhibit 1 which is --

6                    MS. BOSWELL:  Copy of text messages.

7                    THE COURT:  -- copy of text messages.

8                    (Exhibit No. 1 was marked.)

9                    THE COURT:  That would be from Hazelhurst

10   to Phillips, text messages?

11   BY MS. BOSWELL:

12   Q.    Whose phone was this off of again?

13   A.    It was Ms. Hazelhurst's telephone.

14   Q.    And the threat that is contained on Exhibit 1,

15   whose phone did that come from?

16   A.    I'm sorry, repeat that.

17   Q.    The threat that came to her phone came from who?

18   A.    Andrew P.

19   Q.    She identified that as Mr. Phillips?

20   A.    Yes, ma'am.

21   Q.    Okay.  If you will then, read what the text message

22   on her phone stated.

23   A.    I'm going to kill Stan and his children and fuck

24   his wife if she's decent looking.

25   Q.    Based upon your training and your experience, Agent

1    Krieger, did these text messages, the ones you referred

2    to from the source's phone, as well as this one from

3    Hazelhurst's phone, did those travel in interstate

4    commerce?

5    A.    Yes.

6    Q.    And these were communications that threated to

7    injure a person, specifically Stan Jones?

8                   MR. MCAFEE:  I object to (inaudible).

9                   THE COURT:  Can you re -- well.

10   BY MS. BOSWELL:

11   Q.    Were these communications threatening, Agent?

12   A.    Yes, ma'am.

13                  MR. MCAFEE:  I'm going to object to the

14   legal conclusion.  Respectfully, that is your decision.

15                  THE COURT:  I'm going to overrule this

16   objection.  Allow the first one, so.

17   BY MS. BOSWELL:

18   Q.    The confidential source, where was that person

19   located when they received the communications?

20   A.    Western District of Tennessee.

21   Q.    Was chain of command within DEA notified of this

22   situation?

23   A.    Yes, ma'am.

24   Q.    Did Agent Jones participate here in this Phillips

25   investigation as far as the arrests or anything to do

1    with that part of the investigation?

2    A.    No, ma'am.

3    Q.    Why not?

4    A.    To protect the safety of him and his family.

5    Q.    During the other open investigation was there a

6    photograph that was obtained of Mr. Phillips with a

7    firearm?

8    A.    Yes, ma'am.

9              MS. BOSWELL:  May I approach, Your Honor?

10             THE COURT:  You may.

11   BY MS. BOSWELL:

12   Q.    Do you recognize that?

13   A.    Yes, ma'am.

14   Q.    Do you recognize who is in that picture?

15   A.    Yes, ma'am.

16   Q.    Who is that?

17   A.    John Kevin Phillips.

18             MS. BOSWELL:  Your Honor, I'd like to get

19   this marked and introduced.

20             MR. MCAFEE:  I object to that.  There has

21   been no foundation that this picture actually accurately

22   portrays a scene.  This witness cannot testify the when,

23   where, what, how or why this picture exists.

24             THE COURT:  Okay.

25             MR. MCAFEE:  He may know, but he's not

1   testified to such.

2                   THE COURT:  I'm going overrule your

3   objection.  Government may proceed.

4                   MS. BOSWELL:  I'd like to get this entered

5   as Exhibit 2.

6                   THE COURT:  All right.  The Court will

7   enter this as Exhibit 2, photograph that you alluded to.

8                   (Exhibit No. 2 was marked.)

9   BY MS. BOSWELL:

10  Q.    Now displaying Exhibit 2.  You've identified this

11  as a photograph of Mr. Phillips?

12  A.    Yes, ma'am.

13  Q.    And do you have training with firearms?

14  A.    Yes, ma'am.  I'm a certified DEA firearms

15  instructor.

16  Q.    Are you able to identify what type of firearm that

17  is based upon the picture?

18  A.    It appears to be a Glock handgun.

19  Q.    Are you familiar through your investigation with

20  prior charges that Mr. Phillips has had?

21  A.    Yes, ma'am.

22  Q.    And are you familiar with the facts and

23  circumstances surrounding an aggravated assault charge

24  that he had?

25  A.    Yes, ma'am, I read the report.

1    Q.    Have you talked to local law enforcement as well

2    concerning that?

3    A.    Yes, ma'am.

4    Q.    Have there been communications between DEA and the

5    victim on this charge?

6    A.    Yes, ma'am.

7    Q.    What was the basis of that charge?

8                MR. MCAFEE:  I object to hearsay.  To just

9    read off what someone else has told him or what he's read

10   somewhere else, that could be done through witnesses.  If

11   they exist and if they can be brought to court it's fine,

12   Your Honor.  This is not evidence that is obviously

13   something that you can trust in.  That's the whole basis

14   for this.  You're supposed to be able to confront

15   witnesses.  That's the basis for hearsay.

16               So I'm objecting based upon hearsay and on

17   the (inaudible).

18               THE COURT:  Okay.  Certainly that is, that

19   is a valid objections at a future hearing.  But in the

20   detention hearing here we are able to take hearsay

21   evidence.  I'm going to overrule your objection on that

22   point.

23   BY MS. BOSWELL:

24   Q.    You can answer the question.  What was the basis of

25   the aggravated assault charge?

1   A.   The basis of the complaint was that John Kevin

2   Phillips and Angela Hazelhurst were travel back from

3   Memphis, Tennessee, and at some point began arguing.  And

4   at some point during that argument the report states that

5   John Kevin Phillips held a firearm to Angela Hazelhurst's

6   head.

7   Q.   And was he, in fact, apprehended in a vehicle?

8   A.   Yes, ma'am.

9   Q.   And was there, in fact, a firearm recovered from

10  that vehicle?

11  A.   Yes, ma'am.

12  Q.   And that charge has been dismissed?

13  A.   Yes, ma'am.

14  Q.   While he was on bond for that aggravated assault

15  charge, did he get arrested again?

16  A.   Yes, ma'am.

17  Q.   What was that for?

18  A.   Driving under the influence.

19  Q.   And was he out on release on the DUI charge when

20  these threats were communicated?

21  A.   Yes, ma'am.

22  Q.   In fact, that DUI charge is still pending?

23  A.   Yes, ma'am.

24            MS. BOSWELL:  Pass the witness, Your

25  Honor?

UNREDACTED TRANSCRIPT

```
 1                    THE COURT:  You may examine the witness.
 2    If you would like to just stay there at your seat or
 3    certainly you can come to the podium.
 4                         CROSS-EXAMINATION
 5    BY MR. MCAFEE:
 6    Q.    Special Agent Krieger?
 7    A.    Yes, sir.
 8    Q.    Good looking tie.
 9    A.    Thank you, sir.
10    Q.    I want to ask you this.  What does diversion cases
11    mean?
12    A.    Diversion, there is a -- within the realm of
13    controlled substances there are various schedules.
14    Schedule II through V can be prescribed by a doctor.  And
15    diversion -- doctor or nurse practitioner or prescriber,
16    whatever you want to call them.  And diversion from that
17    cycle is what we investigate.
18         So at some point it's imported from overseas,
19    let's say the opium, imported from overseas.  It's then
20    brought into the diversion cycle.  Made into pills.
21    Prescribe by a doctor.  Filled by a pharmacist.  And at
22    some point if it isn't all done under the guise of legal
23    means and it's diverted from cycle, that is what we
24    investigate. Violation of controlled substances.
25    Q.    Fair enough.  And at the time that these
```

1   allegations took place, you were investigating Jeffrey

2   Young, right?

3   A.    Our group was investigating Jeffrey Young.

4   Q.    Okay.  And your group, the DEA, was investigating

5   Jeffrey Young; is that right?

6   A.    Yes, sir.

7   Q.    He is a nurse practitioner here in Jackson?

8   A.    Yes, sir.

9   Q.    And Mr. Phillips is a pharmaceutical sales rep, is

10  he not?

11  A.    That's what I understand.

12  Q.    Okay.  Did I understand you correctly when you said

13  that basically Mr. Phillips is best friends with Jeff

14  Young?

15  A.    That's my understanding.

16  Q.    Okay.  That's what your investigation showed?

17  A.    That's correct.

18  Q.    Can you tell the Court when these other text

19  messages -- we have some you've mentioned but you

20  mentioned some others.  When these other texts were made?

21  A.    You would have to be more specific as to the other

22  texts.

23  Q.    I don't make threats, I do.  I've got nothing to

24  lose.  When?

25  A.    Those from Friday, February 24th as well.

1  Q.   Okay.  But we don't have pictures of those, we just

2  have this one.

3  A.   I'm not aware of what evidence you are in

4  possession of.

5  Q.   I'm sorry.  Exhibit 1.  We have pictures of this

6  but not the others.

7  A.   I don't know what is in your possession.

8  Q.   In evidence here today I guess is what I'm saying.

9  A.   Those are the only texts that are in evidence here

10  today.

11  Q.   And this one --  you did look at Exhibit 1, didn't

12  you, before you said that's accurate, that's what I saw?

13  Right?

14  A.   Yes, sir.

15  Q.   So the way the text messages appear on the phone is

16  the ones on the right are going to be the recipient's,

17  the person what owns the phone.  Is that right?

18  A.   No, sir.

19  Q.   So is this his phone or is this the receiving

20  person's phone?

21  A.   That is the receiver's phone.

22  Q.   Okay.  So the receiving person, the person that

23  owns this phone, their messages are going to be the ones

24  that are in dark green on the right.  Is that correct?

25  A.   Either be green or blue.  In this case they're

1   green.

2   Q.    Yeah.  If it was an iPhone it would be blue.  In

3   some of the others are green.  Right?

4   A.    Not entirely accurate.  Yes, if it was to another

5   iPhone it would be blue.  But it could also be going to

6   another iMac or another Apple supported device using

7   isoftware.

8   Q.    Sure.  The person that sent this message stated in

9   the next message, I just woke up.  Right?

10  A.    May I see?

11              MR. MCAFEE:  May I approach?

12              THE COURT:  You may approach.

13              MR. MCAFEE:  Thank you.

14              THE WITNESS:  Yes, sir.

15  BY MR. MCAFEE:

16  Q.    And the response from the person that received

17  those message was?

18  A.    Excuse me.  Can you repeat the question?

19  Q.    Sure.  The response -- after receiving this

20  message, I'm going to kill Stan and his children, fuck

21  his wife if she's decent looking.  The response from the

22  recipient was?

23  A.    You are drunk.

24  Q.    The person that received these messages knew him?

25  A.    Yes.

1    Q.    Knows him, would be more accurate.

2    A.    It was apparent from that.

3    Q.    Yes.  Did your investigation reveal that this

4    person has a significant alcohol problem?

5    A.    That is something that has come up in the

6    investigation.

7    Q.    From more than one source in the investigation.

8    A.    I'm not aware of that.  I'm not sure.  I know it's

9    been mentioned before, but I don't know if it's from more

10   than one source or from -- but I know it has been

11   mentioned previously.

12   Q.    Okay.  This picture --

13              MR. MCAFEE:  This is Exhibit 2 for the

14   record, Your Honor.

15              THE COURT:  Okay.

16   BY MR. MCAFEE:

17   Q.    Whatever is depicted in this picture, when did it

18   happen?

19   A.    I don't know.

20   Q.    Where did it happen?

21   A.    I don't know.

22   Q.    Can you swear to God that that's a gun?

23   A.    No, I cannot.

24   Q.    You can't be certain, but you think it's possible

25   or likely that that is the gun that was involved in the

1    prior charges that was dismissed?

2    A.    Possible or likely is an accurate statement, yes.

3    Q.    Regardless of whether that is that gun or not, the

4    gun involved in those charges is no longer in his

5    possession.

6    A.    Not that I aware of, no.

7    Q.    It's in the possession of the state authorities.

8    A.    Correct.

9    Q.    Okay.  The aggravated assault charges that you

10   spoke about earlier, aggravated assault and false

11   imprisonment, those were dismissed?

12   A.    Yes.  From what I understand because of a

13   jurisdictional issue.

14   Q.    There is a pending DUI.

15   A.    That's what I understand, yes.

16             MR. MCAFEE:  Your Honor, I may have more.

17   Could I have just one moment?

18             THE COURT:  You may.

19   BY MR. MCAFEE:

20   Q.    Special Agent Krieger, these text messages that

21   gave you concern --

22   A.    Yes, sir.

23   Q.    -- they happened last Friday night?

24   A.    I don't believe it was that night.

25   Q.    Okay.

1   A.    They're last Friday.

2   Q.    Uh-huh (affirmative response).   I'm not sure if I

3   understood your question.

4   A.    I wasn't asking a question.

5         You said they were sent last Friday night.   I

6   believe they were sent last Friday, but not during the

7   nighttime.

8   Q.    Okay.  Special Agent Krieger, you don't have any

9   proof that John Kevin Phillips knows Stan -- apologize.

10  Tell me his last name again.

11  A.    Stan Jones.

12  Q.    Jones.

13        You don't have any evidence or proof that John

14  Kevin Phillips knows Stan Jones?

15  A.    Can you define knows.

16  Q.    Knows who he is, what he looks like, where is he,

17  who he is.

18  A.    Other than text messages that weren't on that sheet

19  looking for a cell phone number, things of that sort,

20  trying to find out who Stan Jones was or is.

21  Q.    Sure.  But if I knew somebody's cell phone number

22  that doesn't mean I know who they are or where they are,

23  right?

24  A.    Not who they are.  But there is a plethora of

25  information of open sources that you could find.

1    Q.    For cell phone numbers?  I know --

2    A.    That I --

3    Q.    I know you can --

4    A.    Names, you could, through open source data, find an

5    address, yes.

6    Q.    If you had their name and you knew who their last

7    name was and if you knew their cell phone number, right?

8    A.    I've gone to a site where basically all you had,

9    would need to put in is their name.

10   Q.    You surely have not gone to a site where all you

11   need was Stan.

12   A.    Not just Stan, no.

13   Q.    Okay.

14              MR. MCAFEE:  Thank you, Your Honor.

15              THE COURT:  Any redirect examination?

16              MS. BOSWELL:  Briefly, Judge.

17              FURTHER DIRECT EXAMINATION

18   BY MS. BOSWELL:

19   Q.    Agent Krieger, during the investigation regarding

20   Young, was he found to possess and own firearms as well?

21   A.    Can you repeat the question?

22   Q.    During the investigation regarding Jeff Young was

23   he found to be in possession of and to own firearms?

24   A.    Referring to Mr --

25   Q.    Jeff Young.

1   A.    Yes.

2   Q.    Those firearms were not seized from him as part of

3   that investigation?

4   A.    No, ma'am.

5   Q.    Can a person with a drinking problem pull a

6   trigger?

7   A.    Yes, ma'am.

8               MS. BOSWELL:  That's all the government's

9   proof, Your Honor.

10              THE COURT:  Well, Agent Krieger, you may

11  step down.  Thank you for your testimony today.

12  Certainly you can remain in the courtroom.

13              THE WITNESS:  Thank you, Your Honor.

14              THE COURT:  Okay.  Does the government

15  have any other witnesses?

16              MS. BOSWELL:  No, Your Honor.

17              THE COURT:  Okay.  From the defendant's

18  standpoint do you wish to call any witnesses?

19              MR. MCAFEE:  We would, Your Honor.  Can I

20  have just one moment?

21              THE COURT:  You may.

22              MR. MCAFEE:  Your Honor, I (inaudible).

23              THE COURT:  Yes, please.  Just come to the

24  front here and go toward the circle there and come on up.

25  Before you sit down would you raise your right hand and

1   be sworn as a witness.

2                    ***************

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           ROBIN PHILLIPS THEREUPON CALLED AS A WITNESS

2    ON BEHALF OF THE DEFENDANT, AND HAVING BEEN FIRST DULY

3    SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4                        EXAMINATION

5              THE WITNESS:  Yes, I do.

6              THE COURT:  Now get comfortable there and

7    pull that microphone up closer to you.  Seemed like you

8    have a very quiet voice, and we want to hear what you

9    have to say today.  You may examine.

10             MR. MCAFEE:  Thank you, Your Honor.

11   BY MR. MCAFEE:

12   Q.    Ms. Phillips, state your name for the record.

13   A.    Robin Crawley Phillips.

14   Q.    Where do you live?

15   A.    126 Rolling Oaks Drive in Three Way, Humboldt,

16   Tennessee.

17   Q.    What is your relationship to John Kevin Phillips?

18   A.    My husband.

19   Q.    How long have y'all been married?

20   A.    Twenty-two years, going on 23.

21   Q.    What do you do for a living?

22   A.    I'm a schoolteacher.

23   Q.    Where?

24   A.    Medina Middle School, Gibson County School

25   District.

```
 1   Q.    Do you and Mr. Phillips have children?
 2   A.    We do, we have three.
 3   Q.    Okay.  What are their ages?
 4   A.    We have Jackson, he's 17.  Victoria is 17.  And
 5   then Alden, he just turned 15.
 6   Q.    Okay.  What does Mr. Phillips do for a living?
 7   A.    He's a pharmaceutical sales representative.
 8   Q.    An okay one, mediocre one?
 9   A.    He's great.  He's really good.
10   Q.    In fact, has he received awards and --
11   A.    Several, several.  He's received like plaques and
12   awards.  And this would be -- he just won a trip for the
13   second time for being, it's like a top percentage.  It's
14   really hard because it's against everybody in his company
15   that you have to earn that and then you win, you know, a
16   trip.  And this is the second one.
17   Q.    Was he supposed to be receiving that award in the
18   last couple of days?
19   A.    Yes.
20   Q.    Is he a good provider?
21   A.    Excellent.  He's always put me and the kids first.
22                 MR. MCAFEE:  May I approach?
23                 THE COURT:  You may.  I think we have some
24   tissue.
25                 THE WITNESS:  Thank you.
```

1    BY MR. MCAFEE:

2    Q.    He's not perfect, though, is he?

3    A.    No, sir.

4    Q.    You understand your under oath.  He has a problem

5    with alcohol, does he not?

6    A.    He does.

7    Q.    He needs to address that.

8    A.    Yes.

9    Q.    Have you been able to speak to him since he was

10   arrested?

11   A.    Just a couple of times on the phone, short, just

12   short conversations.

13   Q.    I'm going to go out on a limb here.  You have never

14   been in jail, have you?

15   A.    No, sir.

16   Q.    At this time is it your opinion that the Court has

17   his full and undivided attention?

18   A.    That the Court -- can you repeat that?

19   Q.    Think we've got his attention here today?

20   A.    I think so, yes, sir.

21   Q.    If this Court sets a bond in this case, this Court

22   can put in place, I don't guess I will say anything, but

23   some very pervasive conditions to assure that people are

24   safe and that he comes to court.  Can you say to this

25   Court whether your husband is going to obey those

1   conditions?

2   A.    Absolutely without a doubt, he would obey.

3   Q.    He hasn't obeyed all of them in the past, has he?

4   A.    You mean -- he's not perfect, no, sir.

5   Q.    But given your conversations with him since he is

6   facing these charges, can you say we've got his

7   attention?

8   A.    Absolutely without a doubt.  Absolutely.

9   Q.    Do you want him to get help?

10  A.    Absolutely, yes, sir.  I've expressed that, yes,

11  sir, to him.

12              MR. MCAFEE:  That's all I have, Your

13  Honor.

14              THE COURT:  All right.  Thank you.

15              Any cross-examination?

16              MS. BOSWELL:  Yes, sir.

17                  CROSS-EXAMINATION

18  BY MS. BOSWELL:

19  Q.    Ms. Phillips, you are certainly not aware of what

20  your husband is doing when he's not with you, are you?

21  You don't know what he does when he's not around you.

22  A.    He's not with me all the time.

23  Q.    In fact, he doesn't stay there and sleep with you

24  very often, does he?

25  A.    Well, I mean, we've had some marital problems, but

1    he's —— you know.

2    Q.    Okay.

3    A.    I love my husband.

4    Q.    He stays a lot and spends a lot of time with Jeff

5    Young, doesn't he?

6    A.    He and Jeff Young are friends.

7    Q.    He parties with stripers and drinking and posts

8    things on social media.

9    A.    I don't know about stripers.  I haven't seen my

10   husband posted with any stripers.  I don't know about

11   Jeff Young, but my husband I have not seen posted with

12   any stripers.

13   Q.    Were you aware that —— you see he has a mark on his

14   face today, right?

15   A.    Yes, ma'am.

16   Q.    Were you aware that he made a post as he was

17   getting his MRI that he got hit in the head with a liquor

18   bottle from a female?  Were you aware of that?

19   A.    I was under the impress it was a concussion.

20   Q.    Do you understand that his words were that he got

21   hit in the head by a female?  Were you aware of that?

22   A.    That is not what he told me.

23   Q.    Okay.  Did you know that he would stay a lot of

24   times with Angela Hazelhurst, his girlfriend?  Were you

25   aware of that?

1    A.    No, ma'am.

2    Q.    Were you aware when he was arrested that they were

3    both naked at her house together?

4    A.    No, ma'am.

5    Q.    So you really don't know your husband, do you?

6    A.    I do, but I didn't know that.

7                   MS. BOSWELL:  Nothing else, Your Honor.

8                   THE COURT:  All right.  Any redirect?

9                   FURTHER DIRECT EXAMINATION

10   BY MR. MCAFEE:

11   Q.    Ms. Phillips, if this Court orders him to live at

12   your house until this case is over does he have a place

13   there?

14   A.    Absolutely.

15                  MR. MCAFEE:  That's all I have of Ms.

16   Phillips, Your Honor.

17                  THE COURT:  Okay.  All right.  You may

18   step down.  Thank you, Ms. Phillips.

19                  Any objection to her remaining in the

20   courtroom?

21                  MS. BOSWELL:  No, Your Honor.

22                  THE COURT:  Okay.  If you would like to

23   remain in the courtroom you may have a seat.

24                  MR. MCAFEE:  Can I get my next witness?

25                  THE COURT:  You may.


                       UNREDACTED TRANSCRIPT

1              Ma'am, just come on up to the front and

2    enter the witness stand from the wall there.  Before you

3    sit down will you raise your right hand and be sworn as a

4    witness.

5                        ***************

37

1              RHONDA GREER THEREUPON CALLED AS A WITNESS ON

2    BEHALF OF THE DEFENDANT, AND HAVING BEEN FIRST DULY

3    SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4                        DIRECT EXAMINATION

5              THE COURT:  I need you to get close to the

6    microphone so we can hear you.  You may examine.

7    BY MR. MCAFEE:

8    Q.    Ms. Greer, please state your full name for the

9    record.

10   A.    Rhonda Greer.

11   Q.    Where do you live?

12   A.    I live here in Jackson, Tennessee.

13   Q.    How long have you lived here?

14   A.    Since 1994, '93.  October '93.

15   Q.    Okay.  Where do you work?

16   A.    I work at Kowa Pharmaceuticals America,

17   pharmaceutical company here.

18   Q.    All right.  Is that company related to a company

19   where Mr. Phillips works?

20   A.    No, it's not related.

21   Q.    Okay.  How long have you known Mr. Phillips?

22   A.    Ten to 15 years.

23   Q.    Through school, through --

24   A.    Through work, pharmaceuticals.

25   Q.    Do your companies do business with each other?

1   A.     No.

2   Q.     Okay.  How do you know him through work?

3   A.     Well, most of the pharmaceutical reps in the area

4   know each other.  We see each other at the Jackson Clinic

5   or whatever, various clinics and offices throughout West

6   Tennessee.

7   Q.     Okay.  Is this kind of salesman or sales woman, is

8   there lots of turn over in that industry?

9   A.     There is a lot of turn over.  It's the type of job

10  where you have to be very motivated, very self-motivated.

11  Because if you don't schedule correctly, route correctly,

12  you know, do all the management tasks correctly, making

13  85 percent or above on all tests, you have the ability to

14  lose your job at any time.  Plus there is always

15  downsizing.

16        When I started in 2004 about four reps per

17  company, now about one rep per company.  So it's very

18  streamlined.  And to be a professional at his level --

19                THE WITNESS:  I think you are number one

20  in the nation, right?

21                Should be receiving his medals and his

22  trip right now at the national sales meeting.  He's

23  missing it for this.  You know, to be at that level is

24  just very difficult to achieve.

25  BY MR. MCAFEE:

1  Q.    The shelf life for sales reps like you, like

2  Mr. Phillips is not long?

3  A.    Two years.

4  Q.    How long have you been doing it?

5  A.    Since 2004.

6  Q.    How long has he been doing it?

7  A.    Little longer than that maybe, 2002, something like

8  that, I think.  Few years before me.

9  Q.    Is he a very successful sales rep?

10 A.    Well, obviously.  He's number one in the whole

11 nation.  So he is at the top of his game.  He is the best

12 of the best.

13 Q.    Got a good home?

14 A.    Has a lovely family.  He's the kind of person who

15 he and his wife couldn't have a child so they decided

16 they would adopt.  And so they put in for a child, a boy.

17 And they said, well, maybe should apply for a girl too,

18 and whatever comes first or whatever, you know, you have

19 a better option of one or the other.

20      Both came up at the same time.  And he and his

21 wife are the kind of people that said, we'll take them

22 both.

23 Q.    He has an alcohol problem.

24 A.    I would agree with that.

25 Q.    Needs to address that.

1    A.    I would agree with that.

2    Q.    There are lots of high functioning, whatever, very

3    successful people that need to address these kinds of

4    problems.

5    A.    Some are high functioning, most are not.  But he, I

6    would say, is, yes.

7                    MR. MCAFEE:  May I have one moment, Your

8    Honor?

9                    THE COURT:  You may.

10                   MR. MCAFEE:  That's all I have, Your

11   Honor.

12                   THE COURT:  Any cross-examination?

13                   MS. BOSWELL:  Yes, sir.

14                        CROSS-EXAMINATION

15   BY MS. BOSWELL:

16   Q.    Ms. Greer, regardless then of Mr. Phillips'

17   drinking you would say he's a smart man?

18   A.    I would say he's an intelligent man, yes.

19   Q.    And he's very successful, as you described?

20   A.    He is successful.

21   Q.    Good at his job?

22   A.    He is good.

23   Q.    So he is able to do all of those things regardless

24   of any kind of alcohol problem, right?

25   A.    Well, to my knowledge.

UNREDACTED TRANSCRIPT

1    Q.    Well, you would know, wouldn't you?  You're telling

2    us all this stuff.

3    A.    I see him out in the field doing very well.

4    Q.    In fact, you know him more than just through work,

5    isn't that correct?

6    A.    We are socially friends too.

7    Q.    That's right.  You hang out with he and Jeff Young,

8    correct?

9    A.    On occasion.

10   Q.    You party with them, correct?

11   A.    I'm not a big partier.

12   Q.    Okay.  You understand that we have social media

13   pictures that we are doing a big investigation.  Are you

14   saying that you do not party with those two men?

15   A.    I don't know why you are hostile towards me.

16         I know them socially.  I have seen them on

17   occasion.  I will hang out with them socially, but I

18   don't party.  It's not really my type of thing.

19   Q.    Well, on direct you never mentioned being with him

20   socially, it was just this great work relationship and

21   that you --

22   A.    Well, that's primarily how I know, that's primarily

23   how I know him.

24              MS. BOSWELL:  No more questions, Judge.

25              THE COURT:  Any redirect examination?

1          MR. MCAFEE:  That's all I have.

2          THE COURT:  Okay.  Thank you for your

3   testimony.  You may –– any objection to her staying in ––

4          MS. BOSWELL:  No, Your Honor.

5          THE COURT:  –– or leaving?  If you need to

6   go some place you are welcome to leave, or stay here.

7   You are released from your testimony.

8          THE WITNESS:  Thank you.

9          THE COURT:  All right.  Thank you for your

10  testimony.

11         Any other witnesses you would like to

12  call?

13         MR. MCAFEE:  No, sir.

14         THE COURT:  Okay.  I think the government

15  has the burden in this case.  And normally they open and

16  close and you may, are sandwiched in between.

17         MS. BOSWELL:  Your Honor, as the

18  government put forth the probable cause for this charge.

19  We would like to address the detention issue.

20         The government is obviously seeking

21  detention as to Mr. Phillips.  This is a man who was

22  charged with a aggravated assault involving a firearm.

23  He got arrested with a gun on that occasion.  Was out on

24  bond for that when he got arrested on a DUI.  And is out

25  on release for that when he made the threats.

1              You heard the contents of the threats.
2      This was obviously something that was taken seriously by
3      the agents as well as his agency.  You know, we heard
4      through the direct of his wife that the Court has gotten
5      Mr. Phillips' attention.  Well, he sure got the attention
6      of these police officers and law enforcement agents that
7      are merely out here trying to do their job.
8              You don't threaten these guys.  You don't
9      say you're going to kill them or kill their children and
10     fuck their wife.
11             This is a person who has access to
12     firearms.  Even if that one particular firearm is in
13     evidence, according to the presentence report -- sorry,
14     the pre-trial report, he owns firearms and they're
15     present in his home.  Even if they -- they will try to
16     bring up that Your Honor can order him not to have any.
17     That will not keep him from having access to them.
18             His good friend Jeff Young owns and
19     possesses firearms.  Your Honor has heard the proof of
20     how closely tied they are.
21             With all due deference to the witnesses
22     that they try to put forth, the last one put forth to you
23     on direct only this work relationship, didn't let you
24     know that she hangs out with him and that there is a
25     social relationship as well.

1              I think it's obvious from the situation of
2    his arrest, and the proof that the government has put
3    forth, that he's not this great family man that is
4    staying at home with his wife either.  He's definitely a
5    danger.  He has access to guns.  And the government's
6    position, alcohol only makes that worse.  That makes him
7    definitely a person with no fear and somebody that would
8    go through with these threats, Your Honor, based off an
9    investigation that was going on against his friend.
10             We're definitely asking Your Honor to
11   detain Mr. Phillips.
12             THE COURT:  Okay.  All right.  Defense.
13             MR. MCAFEE:  Thank you, Your Honor.
14             There is ample proof that Mr. Phillips has
15   many ties to this community.  You've seen the report.
16   Probably more anchors here than any case I've handled for
17   a defendant.  He's got family here.  He's got a really,
18   really good job here.  He's also got some problems.
19             He is 45 years old.  I would dare say as
20   many times that you looked at criminal histories you can
21   look and say looks like there is an alcohol problem, when
22   you look at the list of them, when you hear the proof,
23   even in the worst light of it.  And I don't make light of
24   that.
25             Those are clearly not words any grown man

1   ought to be saying.  It's alcohol related.  Even says so

2   right there in the text messages.  You're drunk.

3                    The question from a legal standpoint --

4   this is not a presumption case.  So the question you're

5   asked to answer here is, do the tough job, which is not

6   always the popular job, is whether there is any condition

7   or set of conditions that would assure the safety of

8   people and that he will show up in court.

9                    I respectfully say to the Court, there is

10  not a single question mark about whether he'll show up.

11                    I noted in the report that you have before

12  you that pre-trial noticed that he has traveled to other

13  countries and he has a passport.  He can be ordered to

14  surrender it.  It can be surrender before he's allowed

15  any bond.  I don't know how in the world I can assure

16  this Court that nobody on this planet will hand him a

17  gun.  That his best friend, Jeff Young, won't hand him

18  some gun.

19                    You have jurisdiction and authority over

20  this man right here.  And when you use your authority and

21  when you make decisions in these cases we're supposed to

22  look to see who is it that we can command to do this or

23  to do that.  It's not our fault that Jeff Young is not

24  brought into the courtroom to be told you're not to hand

25  any gun to him.  But you can order him not to touch a

1    firearm and to surrender all of them that you do own,

2    that you do possess.  That you have the authority to do.

3    You can order him not to acquire any, not to touch any.

4              And honestly if you really get down to

5    what is this specter, this concern that's being put

6    before you, that's true with every single person that

7    you've ever granted a bond to.  Every single one of them

8    could find a gun out there if they wanted to in this

9    country, could do it.

10             I respectfully submit that there is an

11   alcohol, if not a drug and alcohol problem here that

12   needs to be addressed.  And it's going to be by somebody,

13   somewhere, some type.

14             Respectfully I submit to this Court that

15   you have his full attention.  You have better levers for

16   making sure that he does what he ought to be doing,

17   because he's a 45 year old man anyway, better levers than

18   anybody ever had.  You have access to them.  You have the

19   authority to do it.  Frankly, I don't have any problem

20   with it.  I want to see that happen.

21             If the concern is that the classes might

22   not work, there are alcohol monitors that can be put on

23   him.  I assume you're aware of these.  But they're

24   essentially like a wrist band or ankle bracelet that can

25   sense -- if you ingest alcohol, you metabolize, that

UNREDACTED TRANSCRIPT

1   sends a signal.  That sends a report that we immediately

2   know he's ingested alcohol.  That's within your reach.  I

3   can find them.

4                There is cellular GPS.  We can know where

5   he is while this case is pending.

6                Now the government states that these words

7   should not have been said and that, of course, they

8   should have been taken seriously.  But you didn't hear

9   any proof that John Kevin Phillips had the knowledge to

10  go through with the threats.  What he had -- the only

11  proof out there at this point, there may be more, what he

12  had was a first name of someone who was investigating his

13  friend.

14               It is shameful language.  It's not what a

15  grown man and adult ought to be saying.  I respectfully

16  say, it's just as likely this is dumb drunkenness as it

17  is that this is a real threat.  Whether you believe this

18  or whether you believe that, you've heard zero proof that

19  he had the means to actually carry through on it, because

20  he didn't.  You don't have any proof that he did.  The

21  presumption is that he should be given a bond. So then

22  the task is what set of conditions can be enough?

23               He has a good home to go to.  Was he doing

24  all the right things?  No, sir.  Has the government

25  proven he was not?  Yes, sir.  You can order him to do it

UNREDACTED TRANSCRIPT

1    and you can enforce that he does it.  And if he violates

2    a semi colon or a comma, you can do something about it.

3    And you know this.

4             This is a person with a good family, with

5    a good job and a good wife to go to.  If he really did

6    say I've got nothing to lose, he was wrong about that.

7             I submit that you can fashion any

8    conditions.  And I don't want you to think that I've got

9    an ego in this.  If I have named off four and you think

10   it really should have been this one, this one and this

11   one instead, you know more about that than I do.  You've

12   done this more than I have.

13            I respectfully submit there are conditions

14   that can be set that will reasonably assure this Court

15   that he will show up where he's supposed to and he will

16   do what is supposed to be done. Thank you.

17            THE COURT:  All right.  Thank you.

18            Anything further from the government?

19            MS. BOSWELL:  I would like to briefly

20   respond to that, Your Honor.

21            THE COURT:  You may.

22            MS. BOSWELL:  Judge, this isn't dumb

23   drunkenness.  This is a crime to threaten a Federal law

24   enforcement agent.  They can't have their cake and eat it

25   too.  Oh, it's just a stupid drunk mistake, he's a big

1    drunk.  But he can follow all of your rules.  He's not

2    too drunk to do that.

3                    Stan Jones and his family are not semi

4    colons or commas.  And if we cannot ensure that he's not

5    going to do something, he cannot be let out, Your Honor.

6    They want to say that every person before you could have

7    this issue.  And that may be true.  But every person

8    before you is not threatening to kill a Federal law

9    enforcement agent and his family and to have sex with

10   their wife.  We want him detained, Your Honor.

11                   THE COURT:  All right.  Thank you.

12                   MR. MCAFEE:  May I respond to that?

13                   THE COURT:  You may briefly.

14                   MR. MCAFEE:  Their own proof, this awful

15   threat, and it is.  If it's a real threat or if it's dumb

16   drunkenness talking.  And that's what the recipient of

17   this said right off the bat.  You are drunk.

18                   THE COURT:  Okay.  Thank you.

19                   Well, certainly this has been well

20   litigated, so to speak, and excellent presentations by

21   both the government and defense.

22                   I am concerned as a Magistrate Judge, that

23   there is clear and convincing evidence that no conditions

24   of combination of conditions of release will reasonably

25   assure community safety.

1                I understand there are problems here with

2   alcohol.  But this -- I think the government has the

3   controlling argument in this case.  I agree with the

4   government's position in this.  And that would be the

5   finding of this Court.

6                I'm also going to find from the standpoint

7   of probable cause as well in this.

8                And I think that's all we can do today in

9   this matter.  I'm going to remanded the defendant over

10  the custody of the Marshal's Office pending his next

11  hearing.

12               (End of Proceedings.)

13               (End of Requested Material.)

14

15

16

17

18

19

20

21

22

23

24

25

51

1            I, Kristi Heasley, do hereby certify that the

2     foregoing 50 pages are, to the best of my knowledge,

3     skill and ability, a true and accurate unredacted

4     transcript from the FTR recording in the matter of:

5

6

7     UNITED STATES OF AMERICA

8                                        )
      VS                                 )NO.17-10018
9                                        )JACKSON, TENNESSEE
                                         )
10    JOHN KEVIN PHILLIPS                 )

11

12

13

14            Dated this 13th day of March, 2017.

15

16

17

18    _____
      Kristi Heasley, RPR
19    Official Court Reporter
      United States District Court
20    Western District of Tennessee
      Eastern Division
21

22                  .

23

24

25

                    UNREDACTED TRANSCRIPT